**UNITED STATES of America**

v.

**Hugo Gabriel JIMENEZ, Cesar Alfonso Romo–Salcido.**

**No. MO–06–M–010, MO–06–CR–040.**

United States District Court,
W.D. Texas,
Midland–Odessa Division.

March 10, 2006.

Jeffrey Parras, Assistant United States Attorney, Midland, TX, for United States.

Thomas C. Reed, Tucson, AZ, for Defendant Hugo Gabriel Jimenez.

Stephen G. Ralls, Tucson, AZ, for Defendant Cesar Alfonso Romo–Salcido.

### THE COURT'S FINDING RELATING TO PROBABLE CAUSE

PLATT, United States Magistrate Judge.

Defendants, HUGO GABRIEL JIME-NEZ (Defendant Jimenez) and CESAR ALFONSO ROMO–SALCIDO (Defendant Romo–Salcido), are charged with the attempt to conceal and transport currency in excess of Ten Thousand Dollars ($10,-000.00) to a location outside the United States to avoid currency reporting requirements in violation of Title 31 U.S.C. § 5332. Before the Court is Defendant Romo–Salcido's Motion to Dismiss Criminal Complaint & Discharge Defendant Based on Lack of Probable Cause. Although Defendant Jimenez has not similarly moved the Court, probable cause findings as to both Defendants are addressed herein.

### RELEVANT FACTS

At approximately 3:30 p.m. on January 30, 2006, Trooper Johnny Anzaldua, an officer with the Texas Department of Public Safety, stopped a Chevrolet Tahoe on Interstate 20 for speeding and for driving on the improved shoulder of the road. The vehicle was traveling westbound in Ward County, Texas.[1] The driver of the

---

**1.** The Court has taken judicial notice of the fact Ward County, Texas is almost exactly 200

vehicle identified himself as Hugo Gabriel Jimenez and provided a California driver's license and resident alien card. Trooper Anzaldua asked Defendant Jimenez for pertinent paperwork. During the ensuing conversation, Trooper Anzaldua noticed that Defendant Jimenez seemed very nervous.

After interviewing the vehicle's passenger, Defendant Romo–Salcido, Trooper Anzaldua further noted several purportedly conflicting statements from Defendant Jimenez and Defendant Romo–Salcido.[2] Trooper Anzaldua then asked Defendant Jimenez for consent to search the vehicle and Defendant Jimenez agreed. During the search, Trooper Anzaldua noticed a void behind the glove compartment and identified what appeared to be bundles wrapped in black electrical tape.

Trooper Randy Tucker and his trained canine arrived at the scene and conducted an examination of the vehicle.[3] The canine alerted to possible contraband in the glove compartment area of the vehicle. There, the Troopers discovered nineteen bundles of U.S. Currency, in denominations of $100, $20, and $10 totaling approximately Two Hundred Seventeen Thousand Dollars ($217,000.00) including two Twenty Dollar ($20.00) counterfeit notes.

After *Mirandizing* Defendant Jimenez and Defendant Romo–Salcido, the Troopers transported them to the Ward County Sheriff's Office, where Department of Public Safety Sergeant Jaime Ramos, Drug Enforcement Administration Special Agent Daniel Salmon, and Task Force Officer Arthur Villareal debriefed Defendant Jimenez. (Defendant Romo–Salcido invoked his right to remain silent at this point). During the interview, Defendant Jimenez made a number of conflicting statements regarding his destination and the manner in which he allegedly purchased the Chevrolet Tahoe. Defendant Jimenez denied any knowledge of the existence of the currency found in the area behind the glove compartment of his vehicle.

During the initial course of interviews by law enforcement officers, Defendant Jimenez stated that he was traveling to Hermosillo, State of Sonora in Mexico to pick-up his family.[4] Additionally, Defendant Jimenez denied any knowledge of the bundles of currency found in the hidden

miles from the United States/Republic of Mexico border and the Port of Entry /Departure in Presidio, Texas. The Court also notes that I–20 westbound in Ward County allows westward travel approximately 90 miles on I–20 where that highway connects with I–10 and allows continued westbound travel for another 150 miles to the next major city, El Paso, Texas. At El Paso, there is not only a Port of Entry/Departure, but locations where the Mexican border is less than 500 yards from I–10. Furthermore, I–10 continues westward from El Paso essentially paralleling the United States/Republic of Mexico border to the South through four states, including a route through Tucson, Arizona.

2. At the preliminary examination, DEA Special Agent Salmon could only identify two inconsistent statements, one by the driver Jimenez and one by Romo–Salcido. The

statements amounted to an inconsistency as to the destination of where the two men stated they were traveling together.

3. It is unclear from the complaint and the testimony at the preliminary examination as to whether the bundles were observed before the canine arrived. The evidence caused the Court to believe the bundles (thought to be drugs) were observed, then the canine alerted, then the bundles were removed. However, this was a confusing area of evidence. Likewise, the moment of arrest was unclear.

4. Although Defendant Jimenez made conflicting statements at other times, for the purposes of probable cause the Court can certainly consider the statement that he was traveling to Hermosillo, Sonora, Mexico as evidence of his intent to depart the United States.

compartment which were located just below the knee and feet of the passenger, Defendant Romo–Salcido. In other words, Defendant Jimenez denied any knowledge of the Two Hundred Seventeen Thousand Dollars ( $217,000.00) of U.S. currency located within reach of both him and his passenger in a concealed, but relatively easily discovered, hidden compartment behind and below the glove box of the Tahoe.

In summary, some of the more relevant facts include that the Defendants were traveling westbound at a time where they were within 200 miles of the United States/Republic of Mexico border and Defendant Jimenez was traveling westward with the stated purpose of entering the Republic of Mexico at the State of Sonora, Mexico. The stated destination of the two Defendants to Troopers at the time of the stop was also inconsistent. Furthermore, Defendant Jimenez was either confused, deceptive, or unclear as to the manner in which he came into possession of the Chevrolet Tahoe, allegedly purchased next to a Wal–Mart parking lot in Tucson, Arizona, but bearing Texas license plates. He was unable to describe the seller from whom he obtained the vehicle. Additionally, he was inconsistent in his statements about the amount actually paid for the vehicle. vehicle. The Tahoe contained receipts for motels, clothing and towels owned by someone (presumably the occupants), and additionally contained 3 cell phones, one of which had a "SIM" device to enhance the ability to communicate in the Republic of Mexico. Since the Defendant Romo–Salcido had invoked his right to remain silent,

the only statements he made, prior to this invocation of rights, occurred at the scene of the traffic stop. Based on the evidence produced at the preliminary examination, Defendant Romo–Salcido's statements were limited in scope, and the only testimonial evidence of an inconsistent statement pertained to his destination with his codefendant Jimenez.

Since the canine had alerted for the presence of contraband near the glove box area, there is evidence the Defendants were operating a vehicle that at some point possessed controlled substances or other contraband at or near the location of the hidden compartment where the Two Hundred Seventeen Thousand Dollars ($217,-000.00) were found. Whether the contraband was simply money or possibly drugs during the eastward movement from the Tucson area (described by Defendant Jimenez) and thereafter currency on the return trip westward is uncertain. Since neither Defendant made a claim to ownership of the money, it appears from the evidence that the Troopers and Agents treated the United States currency as contraband.[5]

## DISCUSSION

### 1) Applicable Law

#### A. Probable Cause

"Probable cause" is "a reasonable ground for belief of guilt" and means "less than evidence which would justify condemnation or conviction." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)(quoting *Brinegar v.*

---

**5.** The Defendants were not charged in the Complaint with a violation of Title 31 related to classic money laundering activities associated with the contraband. Instead they were charged with a violation of Title 31 U.S.C. § 5332 involving the knowing concealment of more than Ten Thousand Dollars ($10,000.00) with intent to evade currency reporting requirements by knowingly attempting to transport monetary instruments from a place within the United States to a place outside of the United States. The statute places emphasis upon the act of concealment ... "knowingly conceals ..." Title 31 U.S.C. § 5332(a)(1). *See* Complaint of January 31, 2006, MO–06–010M.

*U.S.,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)); *see also U.S. v. Woolery,* 670 F.2d 513 (5th Cir.1982); *U.S. v. Ashcroft,* 607 F.2d 1167 (5th Cir.1979). It exists where the facts and circumstances within the officers' knowledge and of which the officers had reasonably trustworthy information is sufficient in itself to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Pringle,* 540 U.S. at 372 n. 2, 124 S.Ct. 795. A concise definition is not possible because probable cause deals with probabilities and depends on the totality of circumstances. *Id.* at 371, 124 S.Ct. 795. Still, a line must be drawn between mere suspicion and probable cause, and that line is so drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances. *Brinegar,* 338 U.S. at 176, 69 S.Ct. 1302. Thus, the question before the Court is whether the facts within the Troopers' knowledge amounted to more than mere suspicion and constituted probable cause. *Id.* at 177, 69 S.Ct. 1302.

### B. Possession

"Possession" may be actual or constructive, may be joint among several defendants, and may be proved by circumstantial as well as direct evidence. *U.S. v. Ruiz,* 860 F.2d 615, 619 (5th Cir.1988)(quoting *U.S. v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982)). Constructive possession is defined as the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance. *Id.*(quoting *U.S. v. Glasgow,* 658 F.2d 1036, 1043 (5th Cir. 1981)). One who owns a motor vehicle in which contraband is concealed may be deemed to possess the contraband. *Id;* *see also U.S. v. Moreno,* 579 F.2d 371, 373 (5th Cir.1978)(as driver of the pickup in which 189 pounds of marijuana were found, driver had sufficient dominion and control to possess the marijuana). However, mere presence in the area where drugs are found is insufficient to support a finding of possession. *U.S. v. Cordova–Larios,* 907 F.2d 40, 42 (5th Cir.1990).

### C. Contraband

There are two types of "contraband" in the Fifth Circuit: contraband *per se* and derivative contraband. *Cooper v. City of Greenwood,* 904 F.2d 302, 304–5 (5th Cir.1990)(citing *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 699–700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965)). Contraband *per se* consists of objects that are "intrinsically illegal in character, 'the possession of which, without more, constitutes a crime.'" *Id.* at 304. In contrast, derivative contraband includes items that are not inherently unlawful, but that may become unlawful because of the use to which they are put. *Id.* at 305. Here, the concealed money would become derivative contraband when the Defendants manifested an intent to take the money across the border without declaring it.

### II. Analysis

As did the defendant in *Maryland v. Pringle,* Mr. Romo–Salcido relies on *Ybarra v. Illinois* to support his contention that guilt-by-association is not sufficient to support a probable cause finding. In *Ybarra,* officers had a search warrant to search a tavern and its bartender for evidence of possession of a controlled substance. *Ybarra v. Illinois,* 444 U.S. 85, 87–88, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Ybarra, one of the tavern's patrons, was arrested after officers found packets containing heroin on his person during a patdown. *Id.* The Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. 338.

But the Supreme Court in *Pringle* distinguished *Ybarra* on the basis that Pringle and his companions were in a relatively small vehicle, not a public tavern. Citing its opinion in *Wyoming v. Houghton*, the Court stated that "a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing." *Pringle*, 540 U.S. at 373, 124 S.Ct. 795 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–5, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). It is certainly reasonable for the Troopers and this Court to consider the probability Defendant Jimenez and Defendant Romo–Salcido were involved in a joint or common criminal enterprise. *See Pringle* at 373, 124 S.Ct. 795.

Defendant Romo–Salcido also relies on *U.S. v. Di Re*. He is correct that the Supreme Court distinguished *Di Re* from the circumstances in *Pringle* based upon the fact that culpability among the group of defendants found in a vehicle was distinguishable. But Defendant Romo–Salcido fails to acknowledge that the distinction resulted from the fact that the investigator in *Di Re* had been told by an informant that he was to receive counterfeit gasoline ration coupons from a certain individual and at a particular place. *U.S. v. Di Re*, 332 U.S. 581, 592–94, 68 S.Ct. 222, 92 L.Ed. 210 (1948). The informant told the investigator that the driver of the vehicle was the individual who had given the informant the counterfeit coupons. *Id.* In addition, the investigator saw the backseat passenger holding counterfeit coupons. *Id.* Di Re's mere presence in the vehicle, without more, was insufficient to support a probable cause finding.

Defendant Romo–Salcido further points out that the *Pringle* Court held that in a situation wherein no one person in a group of three could be singled out as the guilty party, it was reasonable for the police officer to infer that there was probable cause to believe each in the group was guilty of possession of contraband. *Pringle*, 540 U.S. 366, 372, 124 S.Ct. 795, 157 L.Ed.2d 769. He attempts to distinguish *Pringle* by claiming that the glove compartment void was not readily accessible to him, that he was not aware of the existence of the void, and by making various other lack of awareness claims. Defendant Jimenez attempts to distinguish *Pringle* on the basis of the suggestion that there is no evidence Defendant Romo–Salcido opened the glove box or saw the concealed currency. The *Pringle* decision does not declare that *Pringle* opened the glove box (where cash was stored) or opened/observed the interior of the rear seat armrest (where drugs were found). Common to *Pringle* and the case before this Court is the fact occupants of a vehicle are in close proximity to contraband. In fact, Defendant Romo–Salcido was the closest person to the contraband. *Which is a more reasonable inference?* That the Defendants *had knowledge or did not have awareness of the currency* when they made this adventure from a border region in Arizona (Tucson) to Ft. Worth, Texas and were returning westward, traveling to Hermosillo, Mexico.[6] An officer or judge can combine the route of travel with the other circumstances and the Two Hundred Seventeen Thousand Dollars ($217,000.00) found in a concealed compartment in the Tahoe to draw a reasonable inference. How does one then answer the question as to *whether it is more reasonable* to believe the

---

6. Traveling on I–10 westward from Ward County is a direct route toward Tucson, Arizona and thereafter, south to Hermosillo, Mexico, the stated destination of the Defendant Jimenez.

Defendants had knowledge or did not have knowledge of the currency? The answer is that it does not matter which is *more* reasonable. The totality of the circumstances must simply be reasonable to believe a crime is being committed. The hidden compartment was readily accessible to both Defendant Jimenez and Defendant Romo–Salcido.

Here, as in *Pringle,* both Defendants were found in a vehicle, not a public place, and in a situation wherein no one person in a group could be singled out as the guilty party. No witness or circumstantial singling out, similar to that in *Di Re,* occurred. In fact, the circumstances in this case are substantially more similar to those in *Pringle.* Defendants' inconsistent statements in the case at bar provided a broader basis for Defendant Romo–Salcido's arrest than mere presence in the vehicle. The circumstances of the purchase and the operation of the vehicle provide a similar broad base for probable cause support for both Defendants. The Court must bear in mind that *concealment* is an essential element of this alleged crime. Counsel for Defendant Jimenez misplaces emphasis when he suggests in his Post Hearing Memorandum that there was no evidence the Defendant evaded nor attempted to evade the reporting requirement. If Two Hundred Seventeen Thousand Dollars ($217,000.00) has been concealed in a vehicle traveling from the United States to Mexico, it is reasonable to infer no declaration or reporting will occur at the border. This is particularly true when the Defendant Jimenez denies any knowledge of the currency in his vehicle.

Finally, Defendant Romo–Salcido argues that because the charged offense is a reporting and not a possession violation, the evidence does not support a finding of probable cause. Defendant Romo–Salcido misunderstands the standard. Probable cause exists where there is a reasonable belief that an offense has been *or is being committed.* The Supreme Court in *Pringle* did not hold that an officer must have probable cause to believe that the Defendant completed every act of a specific underlying crime when attempt is charged, only that the officer must reasonably believe that a felony has been *or is being committed based upon a totality of the circumstances.* In this case the charge involves an *attempt.* Furthermore, the statute forbids *concealment* with intent to evade reporting. The *"attempt"* offense can be considered completed once concealment with appropriate intent occurs in conjunction with "transportation" or attempted transportation from the United States with movement toward a destination in Mexico.

Here, both Defendants arguably possessed derivative contraband.[7] The Troopers had a reasonable belief—considering the totality of the circumstances—that a felony offense had been committed.

Specifically, the Troopers could reasonably infer:

1) The Defendants were in a common enterprise as they traveled together in the Tahoe;

2) The Defendants, particularly Defendant Romo–Salcido, were in very close proximity to the large amount of concealed currency;

3) The Defendants were traveling westward toward the stated destination of Defendant Jimenez, Hermosillo, in the State of Sonora, Mexico;

---

7. Defendant· Romo–Salcido argues that Special Agent Salmon's final conclusion on the witness stand was that there was no evidence Defendant Romo–Salcido knew of the currency. The statement was derived from cross-examination and *the Court ultimately* must make the determination of the totality of the evidence.

4) Defendant Jimenez was nervous and inconsistent in his statements;

5) Defendant Jimenez provided a weak and suspicious explanation for his possession of a Tahoe he had purchased, which just happened to have a hidden compartment, a concealed area to which a drug canine alerted, and specifically a hidden compartment with Two Hundred Seventeen Thousand Dollars ($217,000.00) in U.S. currency.

6) The Defendant Jimenez proclaimed that he did not know about the money he was apparently carrying to a stated destination in Mexico; [8]

7) The Officers could infer the Defendants did not intend to declare money that was concealed. This is particularly true when such a large sum is concealed under such suspicious circumstances;

8) The funds were derivative contraband or the funds would not have required concealment;

9) The completion of the crime of actual transportation of the currency to a point outside the United States at the Mexican border was thwarted by the actions of the Troopers in Ward County, therefore an attempt has been charged.[9]

This Court thus finds that it was reasonable for the Troopers to infer that there was probable cause to believe each of the

8. It would be disingenuous and not credible to argue the men planned to drop the money at a location in the United States when Defendant Jimenez, the vehicle owner and operator claimed no knowledge of the funds. His own words suggest the destination was Mexico.

9. Counsel for Defendant Jimenez orally raised the issue of proper venue. Although the Court believes the venue question is one for the District Judge, the undersigned will express views regarding the propriety of Western District of Texas venue. Because Congress did not specifically provide for venue in Chapter 33 of Title 31, 18 U.S.C. § 3237 controls, which states in pertinent part:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was *begun, continued, or completed.*

Any offense involving...*transportation in interstate* or foreign commerce,...is a continuing offense and...*may be inquired of and prosecuted in any district from, through, or into which* such commerce, mail matter, or imported object or person moves.

18 U.S.C.A. § 3237(a) (2000)(emphasis added). Proper venue in such cases is determined via a two-step inquiry: the court must initially identify the conduct constituting the offense, that is, the nature of the crime, and then it must discern where the criminal acts were committed. *U.S. v. Clenney,* 434 F.3d 780 (5th Cir.2005). For the particular offense at issue here, *U.S. v. Donahue,* a Third Circuit case, is instructive. *Donahue* involved an offense alleged under 31 U.S.C. § 5316, which requires filing a report when "a person, agent or bailee knowingly transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time from a place in the United States to or through a place outside the Untied States..." 31 U.S.C.A. 5316(a)(1)(A) (2003). The difference between § 5316 and § 5332 is that § 5316 is a reporting offense and § 5332 is a smuggling offense. The elements of both include a "transport" prong.

In *Donahue,* venue was proper in the Middle District of Pennsylvania, where the defendant was alleged to have knowingly transported currency from Pennsylvania to Grand Cayman Island without filing the required reports because the offense was a continuing violation under § 3237(a). Donahue argued that the situs of the crime was Miami, where the report should have been filed. The Court stated that the problem with that analysis was that it focused only on one aspect of the conduct proscribed by 31 U.S.C. § 5316. The defendant's argument ignored the fact that, standing alone, the failure to file a report was not unlawful; such failure must be accompanied by the knowing transportation of currency out of the country to become a crime. The

two Defendants were guilty of possession of contraband.

Defendant Romo–Salcido's Motion to Dismiss Criminal Complaint & Discharge Defendant Based on Lack of Probable Cause is **DENIED**.

It is so **ORDERED**.

Court agreed with the government that the conduct underlying the defendant's conviction constituted an offense begun in one district and completed in another under 18 U.S.C. § 3237(a), since the evidence established that the defendant, bearing large sums of currency, on various occasions boarded a plane in Pennsylvania, changed planes in Florida without filing the requisite report, and proceeded on to Grand Cayman Island. The Court stated that this uninterrupted series of events was properly regarded as one continuing offense for purposes of venue beginning in Pennsylvania and ending in Grand Cayman Island.

The elements of the offense at issue here under § 5332, like § 5316, include an intent to transport currency in excess of $10,000 from a place within the U.S. to a location outside the U.S. The Defendant Jimenez's argument asserts that venue is only proper at the port of entry/exist, where the failure to report would have allegedly occurred. As demonstrated above, even for a completed offense under 18 U.S.C. § 5332, venue would be proper in the Midland/Odessa Division.

But the charge here is an inchoate offense. The Fifth Circuit·has held that an alleged inchoate offense does not remain inchoate, but becomes complete upon commission of an element of the offense with the requisite knowledge or intent to commit the entire offense. In *U.S. v. Reinhart,* the Court held that where the offense, a § 2251(a) violation predicated on a defendant's knowledge or intent to transport pornography, formed at the time of the visual depiction, does not remain inchoate, but rather is complete the moment the depiction is created with the requisite knowledge or intent. The government was not required to prove that the depiction was actually transported across state lines.

Here, the alleged offense was complete once the Defendants hid the money with the intent of smuggling it into Mexico and attempted to transport it. The violation then continued as Defendants made their way through the Western District of Texas towards the border.